IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **ARON YELLOTT** § § § § *Plaintiff* § **VERSUS** § § **PACKAGING CORPORATION OF AMERICA** § § *Defendant* § | | CIVIL ACTION NO: _____ JURY DEMAND HEREIN |

## PLAINTIFF'S ORIGINAL COMPLAINT

**NOW COMES** Plaintiff, **ARON YELLOTT**, by and through undersigned counsel, for her Original Complaint against Defendant, **PACKAGING CORPORATION OF AMERICA**. She hereby states as follows:

## JURISDICTION AND VENUE

1. Plaintiff brings action under Title VII of the Civil Rights Act of 1964 as it appears at 42 U.S.C. § 2000e *et seq.*, and Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.*

2. This Court has jurisdiction pursuant to the following statutes:

    a. 28 U.S.C. § 1331, which gives district courts original jurisdiction over civil actions arising under the Constitution, law or treaties of the United States;

    b. 28 U.S.C. § 1343 (3) and (4), which give district courts jurisdiction over actions to secure civil rights extended by the United States government;

3. It is a jurisdictional requirement of this Court that the Plaintiff has filed a charge with the Equal Employment Opportunity Commission (EEOC) prior to instituting action. Plaintiff met this requirement by filing her EEOC charge on or about April 27, 2017 (Charge No. 461-2017-00862).

4. The EEOC mailed Plaintiff her Notice of Suit Rights on February 6, 2018. *See* Exhibit A. Plaintiff is afforded 90 days from her receipt of such Notice to commence suit, and the date of this filing is within the statutory period.

5. Venue is appropriate in this judicial district under 28 U.S.C. § 1391 (b) because the events that gave rise to this Complaint occurred in the Western District of Louisiana, specifically in Beauregard Parish, making the Lake Charles Division the most appropriate Division for this suit.

## PARTIES

6. Plaintiff is a citizen of the United States and resides in the State of Tennessee.

7. Plaintiff is a female and, as such, is a member of a protected class.

8. Plaintiff has been medically diagnosed with AD/HD, Depression, and Anxiety.

9. Defendant, **PACKAGING CORPORATION OF AMERICA** (hereinafter "PCA"), is a municipal corporation organized and existing under the domestic laws of the State of Delaware. Its principal business establishment in Louisiana is located at 8550 United Plaza Blvd., Baton Rouge, Louisiana 70809.

10. At all times relevant to this suit, Plaintiff worked for Defendant at its DeRidder Containerboard Mill, located in DeRidder, Louisiana, which is within this judicial district.

All claims that form the basis of this complaint arose from Plaintiff's employment at PCA's DeRidder Containerboard Mill.

11. PCA is an "employer" as defined in 42 U.S.C. § 12111(5) and thus subject to the requirements of the Americans with Disabilities Act (ADA). The entity has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding year.

## FACTUAL ALLEGATIONS

1. Plaintiff was medically diagnosed with Depression and Anxiety as early 2007. She was very open with PCA personnel about her diagnosis throughout her employment with PCA.

2. Plaintiff began her employment with PCA was a Senior Environmental Affairs Associate on September 14, 2015. She worked in such capacity until her termination on January 20, 2017.

3. As part of the hiring process, Plaintiff was required to complete various forms. Plaintiff completed a Voluntary Self-Identification of Disability form. *See* Exhibit B.

4. Plaintiff requested a meeting with Defendant's Human Resources Manager, Brent Hansen, to discuss her diagnosis of AD/HD. During this meeting, Plaintiff notified Mr. Hansen that her condition required, as a reasonable accommodation, classroom or on-hands training in lieu of internet training modules, as well as a monthly physician appointment to renew her prescriptions.

5. During the meeting, Plaintiff also asked Mr. Hansen how to properly fill out the disability disclosure form. Mr. Hansen stated that the only intellectual disability listed on the form

was classified as "Mental Retardation," which did not properly classify the condition from which Plaintiff suffers. Therefore, Mr. Hansen advised Plaintiff that she should check, "NO, I DO NOT HAVE A DISABILITY" on the document. Plaintiff did as she was instructed. *See* Exhibit B.

6. In light of the foregoing meeting, Defendant was made aware of Plaintiff's AD/HD, along with her requests for reasonable accommodations, as early as April 2016.

7. Beginning on or about April 2016, and continuing on a weekly basis, Plaintiff asked questions to further her understanding of her job duties and/or requested additional training. In response to these inquiries, Blaine Butaud and Tim Byrd made disparaging comments about Plaintiff's intelligence, oftentimes calling her "stupid."

8. During June and July 2016, while performing her respective job duties, Plaintiff uncovered various miscalculations in the waste reports being generated by Defendant. Such miscalculations would affect Defendant's tax liability, which led Plaintiff to advise her supervisors of her concerns. Plaintiff further reported issues she was experiencing with the contractor she was being forced to use on the various charges she was assigned to handle, Madeline Murphy, who had engaged in a romantic relationship with PCA employee, Blaine Butaud.

9. On one occasion, a major spill impacted the soil at the facility. Plaintiff was charged with cleaning the facility without having received the necessary and annually mandated HAZWOPER and RCRA refresher training to instruct employees on proper spill clean-up procedure. In response to her questions and concerns in handling the situation absent such critical training, Blaine Butaud and Tim Byrd disregarded her questions, instead telling her that she "should just know how to handle this" and that her questions were stupid.

10. Plaintiff requested training on various occasions, and she was told by PCA management that such training was a waste of money and unnecessary.

11. At the end of July 2016, Plaintiff took two (2) weeks off in accordance with the Family and Medical Leave Act of 1993 (FMLA) due to crippling Anxiety and Depression. Subsequently, Plaintiff's physician and Defendant's Employee Assistance Program required her to attend frequent doctors' and counseling appointments.

12. Therefore, Defendant obtained actual knowledge of Plaintiff's Anxiety and Depression, at the latest, in July 2016. Plaintiff avers that Defendant was made aware of her diagnosis prior to July 2016 as a result of her various conversations with PCA personnel.

13. Upon Plaintiff's return to work, Blaine Butaud instructed Plaintiff in person and via e-mail communication that she would be allowed to leave the facility for lunch to pick up her daughter from school, but that she would be required to be at the mill for eight (8) hours each day. Furthermore, Plaintiff was requirement to make up any balance of hours for which she would be absent.

14. Aside from her FMLA leave, Plaintiff had been working at the mill at least eight (8) hours a day each day from the time she began her employment with Defendant.

15. Plaintiff was not reprimanded nor counseled for any alleged absences.

16. In October 2016, Plaintiff reported a system error in the condensate tank, which went unaddressed by Defendant's management.

17. Blaine Butaud consistently made disparaging comments to Plaintiff, including, but not limited to: "everything that comes out of your mouth is dumb," "all you do is whine about everything," and "you sit at your desk and say 'I want to learn,' but you don't do anything."

18. In December 5, 2016, Plaintiff reported an issue with the potable water system, indicating that the water was being over-chlorinated and could result in chlorine gas leaking out of water faucets. When Plaintiff stated her concern to Blaine Butaud via telephone call, he told her, "that was the stupidest thing anyone has ever said," and hung up on her.

19. On December 6, 2016, Blaine Butaud, in the presence of HR Manager Brent Hansen, told Plaintiff that she had failed at her job in every way and generated problems for him. He further told Plaintiff that she knew nothing about the business and everything she did was stupid, including what she speaks. Although Plaintiff tried to defend herself and her intelligence, Blaine Butaud continued to berate her.

20. On December 7, 2016, Plaintiff informed Blaine Butaud and Brent Hansen of safety hazards regarding pure lime material being pumped into an on-site pond, which was a legal violation due to the waste altering the pH level of the water flowing into the Calcasieu River. Plaintiff had previously reported these hazards to Tim Byrd, who told Plaintiff that she was "stupid" and "couldn't do anything correct," and that no one wanted to work with her. Blaine Butaud dismissed Plaintiff's concerns and told her that "everyone thinks you are just some cute, dumb, southern girl."

21. At no time prior to the December 7, 2016 meeting had Plaintiff been informed that she would receive a "needs improvement rating" or that she would not be receiving a raise like that of the other employees.

22. In response to Blaine Butaud's comment, Plaintiff became upset. When she started showing signs of emotion, Blaine Butaud told her that "you need thicker skin."

23. Following the December 7, 2016 meeting, Plaintiff asked various employees whether Blaine Butaud and Tim Byrd's sentiments were shared throughout the facility. None of the

employees with which she spoke shared the beliefs shared by Blaine Butaud and Tim Byrd at the December 7, 2016 meeting.

24. Plaintiff was never informed that she would be put on a performance improvement plant, not was any performance review discussed with Plaintiff. Further, Plaintiff never received a copy of the report Defendant purports to have completed pertaining to her allegedly deficient performance.

25. Plaintiff's concerns with the over-chlorination of water were so severe that she sent a text message to Safety Manager, Rick Butterfield, on December 16, 2016 to ensure that someone received word of her legitimate concerns.

26. On December 21, 2016, Plaintiff inquired about her personnel file, asking whether any disciplinary actions had been filed or otherwise taken against her. Brent Hansen informed Plaintiff that there was no record of any complaints of disciplinary actions in her personnel file at this time.

27. During the course and scope of her employment, Plaintiff repeatedly and continuously reported safety violations to her male supervisors. In response to her reports, she was repeatedly berated, which created fear and anxiety as well as, un unwarranted hostile work environment.

28. In response to the hostile work environment, Plaintiff requested to be transferred so that she would be under the different of a different manager. In response thereto, Plaintiff was told that she had to work with Blaine Butaud and that she just needed to stop communicating so heavily with e-mail.

29. On January 20, 2017, Plaintiff was terminated by Brent Hansen, Blaine Butaud, and Eric Snelgrove for "gross dishonesty." The meeting lasted approximately five (5) minutes, and

Plaintiff was given no explanation for her termination other than a blanket accusation of "gross misconduct."

30. Upon her termination, Defendant actively precluded Plaintiff from retrieving any of her personal belongings from the office, including the company phone and a jump drive.

31. Despite Plaintiff's request for a termination slip, Defendant refused to provide her with one.

## FIRST CAUSE OF ACTION:
## DISABILITY DISCRIMINATION IN EMPLOYMENT/ FAILURE TO ACCOMMODATE
*Pursuant to 42 U.S.C. § 12101s et seq.*

32. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

33. The ADA expansively prohibits discrimination in employment against persons with a disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment. 42 U.S.C. §12112(a).

34. The ADA prohibits an employer's failure to make reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability. 42 U.S.C. § 12112(b)(5)(a).

35. Reasonable accommodations may include job restructuring, part-time or modified work schedules...appropriate adjustment or modification of training materials or policies... and other similar accommodations. 42 U.S.C. § 12111(9).

36. Plaintiff, with her medical diagnoses of AD/HD, Anxiety, and Depression, which are mental impairments as contemplated by the law. *See* 42 U.S.C. § 12102. She is being treated for these conditions.

37. Plaintiff's mental impairments substantially limit the major life activities of concentrating, thinking, learning, and working. Without proper medication, training, and a proper work schedule, Plaintiff is unable to concentrate and perform any job duties effectively.

38. Defendant's statements to Plaintiff about her being terrible at her job indicate that Defendant perceived Plaintiff's AD/HD, depression, and anxiety as disabilities to the extent that they affected her ability to perform her job duties effectively.

39. Plaintiff was qualified for her job as Senior Environmental Affairs Associate, and could easily perform her functions satisfactorily when provided with the requisite training modules and the slightly modified work hours to accommodate the effectiveness of her medication. Plaintiff was interviewed by numerous members of PCA management and was specifically hired based on her impressive credentials, knowledge, and experience. Moreover, several PCA employees can attest to Plaintiff's work ethic and performance.

40. Plaintiff specifically requested reasonable accommodations, including in-person, hands-on training in lieu of internet training modules, reasonable time to attend her physician's appointments to maintain her prescriptions, and reasonable work hours that would accommodate the effectiveness of her medications.

41. Plaintiff's medications remain active for approximately eight (8) hours. Once her medication wears off, Plaintiff has an exceptionally difficult time staying focused, remembering small details, and controlling her underlying anxiety and depression

42. Plaintiff suffered material adverse employment action by: 1) being denied training she specifically requested; 2) being verbally berated for not knowing the proper procedure, despite that she was overtly denied training on various, pertinent subjects; 3) being called stupid and other derogatory words because she did not know the proper procedure specially required by Defendant's plant; 4) being required to stay at the facility longer hours so that her medications would lose their effect.

43. Defendant treated others outside the protected class more favorably than Plaintiff.

44. Plaintiff's disabling conditions were a determining factor in treating Plaintiff less favorably than non-disabled, similarly situated employees.

45. Upon good faith belief, based on disparate treatment, Plaintiff alleges that she was subjected to unlawful discrimination on the basis of her disability.

46. Defendant's proffered reason for termination, "gross dishonesty," is pretextual and is not the true reason for Plaintiff's termination. In fact, correspondence indicates that there existed various miscalculations and other safety issues within Defendant's facility, such that the Defendant cannot in good faith state that Plaintiff's assertions were dishonest.

47. Wherefore, Plaintiff asks this Honorable Court to find Defendant liable for the violation of the Americans with Disabilities Act.

## SECOND CAUSE OF ACTION:
## SEXUAL DISCRIMINATION IN EMPLOYMENT
*Pursuant to 42 U.S.C. 2000e et seq.*

48. Plaintiff incorporates and restates each of the above paragraphs as if fully set forth herein.

49. Plaintiff is a woman and is therefore a member of a protected class.

50. On multiple occasions, Plaintiff, in the course and scope of her employment, brought several environmental, health, and safety concerns to members of PCA management. Plaintiff's supervisors, rather than addressing her concerns, ignored her requests and instead told her she didn't know what she was doing.

51. Instead of rectifying her concerns, Blaine Butaud and Tim Byrd deliberately berated Plaintiff and told her that she was doing a terrible job.

52. In contrast, any time a male employee reported concerns, they were addressed immediately.

53. Further, Plaintiff was good friends with one of the corporate electricians at PCA, Todd Schoof. One day, Mr. Schoof walked into Plaintiff's office to have a friendly conversation; however, she was thereafter reprimanded for having a man in her office by Assistant Mill Manager Thomas (last name unknown at this time). She was deemed "inappropriate" for speaking with her male counterparts; however, Blaine Butaud was allowed to carry on a romantic relationship with Madeleine Murphy without any repercussions whatsoever.

54. During the December 7, 2016 meeting, Blaine Butaud told Plaintiff that she was nothing but a "cute, dumb, Southern girl." Plaintiff was immediately insulted and outraged, and she told Brent Hansen that such a sexist comment was completely uncalled for and inappropriate.

55. Despite the discriminatory comment and the obvious negative effect, the comment had on Plaintiff, Mr. Hansen refused to act. In fact, Mr. Hansen left the facility immediately following the meeting's conclusion. Plaintiff immediately informed a back-end employee, John "Big Daddy" Reddin of the comment, who immediately called Thomas and told him that the sexual harassment needed to be reported and addressed.

56. Despite the conversation mentioned in Paragraph 54, no action was taken by PCA.

57. Plaintiff's sex, female, was a determining factor in treating Plaintiff less favorably than male employees.

58. Upon good information and belief, based on disparate treatment, Plaintiff alleges that she was subjected to unlawful discrimination on the basis of her sex.

59. Defendant's proffered reason for termination, "gross dishonesty," is pretextual and is not the true reason for Plaintiff's termination. In fact, correspondence indicates that there existed various miscalculations and other safety issues within Defendant's facility, such that the Defendant cannot in good faith state that Plaintiff's assertions were dishonest.

60. Wherefore Plaintiff asks this Honorable Court to find Defendant liable for the violation of Title VII of the Civil Rights Act of 1964.

## THIRD CAUSE OF ACTION:
### RETALIATION
*Pursuant to 42 U.S.C. § 2000e-3(a) and 42 U.S.C. §12203*

61. Plaintiff incorporates and reinstates each of the above paragraphs as if fully set forth herein.

62. Title VII makes it an unlawful employment practice for a person covered by the Act to discriminate against an individual "because he has opposed any practice made an unlawful practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceedings, or hearing under this subchapter. 42 U.S.C. § 2000e-3(a).

63. 42 U.S.C. §12203 of the ADA prohibits retaliation against an individual who has opposed any act or practice made unlawful by the Act's anti-discrimination provisions.

64. Plaintiff advised Defendant, through its agents and officers, of what she reasonably perceived to be illegal discriminatory activity exhibited by Blaine Butaud and Tim Byrd

on various occasions. She constantly opposed their refusal to provide her with training and guidance, their subsequent berating and harassment of her for being "stupid" and not knowing how to do her job, and their refusal to acknowledge her concerns, instead discounting her ideas as the result of her being a female in a male-dominated industry.

65. Upon good information and belief, the numerous instances of discriminatory conduct set forth in this complaint constitute a systemic pattern of retaliation, with one event taking place as a result of Blaine Butaud and Tim Byrd against Plaintiff for her complaints of or opposition to the previously occurring discriminatory activity.

66. Defendant, through its agents, supervisors and/or employees, in a continuing course of conduct, subjected Plaintiff to retaliation and discrimination in the terms, conditions, and privileges of her employment in retaliation for her opposing what she believed to be unlawful conduct on various occasions.

67. Any time Plaintiff would request additional training, Blaine Butaud and/or Tim Byrd would verbally chastise her and then alter a term of her employment, whether through changing her work hours or disallowing her from pricking up her daughter during her lunch hour. The environmental department schedule was extremely relaxed, and Plaintiff's leaving for lunch to pick up her daughter from school did not pose any problem until Plaintiff began raising her concerns with the health and safety violations, in addition to the lack of training and disparaging remarks.

68. Blaine Butaud and Tim Byrd applied "rules" differently to Plaintiff than to all other PCA employees. Following her complaints, Plaintiff was required to be at work by 7:00 AM and expected to remain at the office until after 5:00 PM. This schedule change directly

contravened PCA's interview-promise to maintain Plaintiff's work schedule from 8:00 to 4:00 PM.

69. Defendant's change in Plaintiff's hours effectively precluded her from attending her monthly physician's appointments to obtain a new, monthly prescription for her medications. Because her physician's office was not open on the weekends, Plaintiff had to see the physician during PCA's operating hours. By extending Plaintiff's hours from 7:00 AM to at least 5:00 PM (and therefore, from effectively 6:30 AM to 5:30 PM), PCA actively precluded her from renewing her prescriptions in a timely manner.

70. Any other employee required to be present at the 7:00 AM was allowed to leave work by 3:30 PM, if not earlier. The entire back-end crew, including but not limited to John Reddin, Stephanie Partridge, Stacey Miller, and Paul Weeks, were allowed to leave by 3:30 PM.

71. Following her complaint, Blaine Butaud assigned Plaintiff the impossible task to visually judge zinc meter readings, which was known throughout the facility as an impossible task. The meters could not read through the pipe because the pipe did not have a continual flow. The task effectively sent Plaintiff on a wild good chase, and it required her, along with aiding employees, to stay outside in freezing cold weather in an attempt to get the meter to read the pipe. Several employees attempted to help Plaintiff accomplish this task and can attest to the impossibility thereof.

72. Plaintiff was expected to be at work, even if she was legitimately ill; however, Blaine Butaud and Tim Byrd were allowed to miss extended periods of time from work. Tim Byrd was allowed to miss work because his neck hurt, and that was deemed an acceptable excuse. Blaine Butaud called in because he had Diarrhea, and that was deemed an acceptable excuse. When Plaintiff contracted the flu, she was expected to be at work.

73. Defendant's proffered reason for termination, "gross dishonesty," is pretextual and is not the true reason for Plaintiff's termination. In fact, correspondence indicates that there existed various miscalculations and other safety issues within Defendant's facility, such that the Defendant cannot in good faith state that Plaintiff's assertions were dishonest.

74. Defendants failed to act in accordance with 42 U.S.C. § 2000e-3(a) and 42 U.S.C. §12203.

75. Defendants' retaliation is willful, intentional, and committed with malice or reckless indifference to the protected rights of Plaintiff.

76. As a result of Defendant's discriminatory conduct, Plaintiff has suffered and will continue to suffer pecuniary losses, including but not limited to lost wages and other benefits associated with her employment.

77. As a result of Defendant's discriminatory conduct, Plaintiff has suffered non-pecuniary losses including but not limited to emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary losses to be more fully developed at the trial on this matter.

78. Defendant failed to act in accordance with 42 U.S.C. § 2000e-3(a) and 42 U.S.C. §12203.

79. Wherefore, Plaintiff asks this Honorable Court to find Defendant liable for the violation of 42 U.S.C. § 2000e-3(a). and 42 U.S.C. §12203.

**FIFTH CAUSE OF ACTION:**
**HOSTILE WORK ENVIRONMENT**

80. Plaintiff incorporates and reinstates each of the above paragraphs as if fully set forth herein.

81. The constant threats of termination, the discriminatory remarks made to Plaintiff regarding her intelligence and sex, the overt denial of training and protective attire, and the

unwarranted schedule change caused Plaintiff substantial embarrassment, grief, anxiety and mental anguish.

82. The harassment was so severe or so pervasive that it altered the conditions of Plaintiff's employment and created an abusive atmosphere. The continued harassment prompted Plaintiff to ultimately request to be transferred under a different member of management.

83. Although Defendant was made aware of the hostile work environment promulgated by Blaine Butaud and Tim Byrd, Defendant took no remedial action to stop the hostile environment and to prevent this type of unlawful activity from occurring.

84. As a result of the hostile work environment sustained by Defendant, Plaintiff sought counseling for her anxiety and depression several times from August 2016 through her termination in January 2017.

85. Defendant, through its agents and officers, knowingly, and intentionally allowed the hostile work environment to exist.

86. Defendant, by its overt act or failure to act herein, supported the ongoing hostile work environment.

87. Wherefore Plaintiff asks this Honorable Court to find Defendant liable for creation of a hostile work environment based on Plaintiff's sex and disability in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

**SEVENTH CAUSE OF ACTION:**
**RESPONDEAT SUPERIOR**
*Pursuant to La. Civ Code art. 2320*

88. The acts of Plaintiff's supervisors, managers, and co-workers were performed while the actors were within the course and scope of their employment with Defendant.

89. The conduct of Plaintiff's supervisors, managers, and co-workers as outlined herein was approved by Defendant, as Defendant took no steps to change, alter, stop, or modify said conduct.

90. At the time of the conduct, Plaintiff's supervisors and managers were acting on Defendant's behalf.

91. After the events complained of, Defendant was made aware of Plaintiff's supervisor's acts, and approved them by its continuous failure to act.

92. Therefore, Defendant PCA is liable for the acts of Plaintiff's supervisors and managers as outlined herein.

### PRAYER:

**WHEREFORE**, Plaintiff requests that this Honorable Court enter judgment against Defendant providing the following relief:

(a) All damages to which Plaintiff may be entitled, including but not limited to back pay, reimbursement for lost position and training, social security and other benefits, front pay, and any and all statutory relief;

(b) Punitive or exemplary damages;

(c) Liquidated damages;

(d) Reasonable attorney's fees, with conditional awards in the event of appeal;

(e) Pre-judgment interest at the highest rate permitted by law;

(f) Post-judgment interest from the judgment until paid at the highest rate permitted by law;

(g) Costs, including expert fees;

(h) Reasonable and necessary medical care and expenses in the past and future;

(i) Mental anguish damages in the past and future;

(j) Injunctive relief; and

(k) Such other and further relief, at law or in equity, to which Plaintiff may be entitled.

---

### DEMAND FOR JURY TRIAL
---

Pursuant to Rule 38 of Federal Rules of Civil Procedure, the Plaintiff demands trial by jury in this action of all issues so triable.

**Respectfully Submitted**,

**SUDDUTH & ASSOCIATES, LLC**
Attorneys-at-Law
4216 Lake Street Suite C
Lake Charles, Louisiana 70605
(337) 480 - 0101 (*Telephone*)
(337) 419 - 0507 (*Facsimile*)

**BY:** /s/ James E. Sudduth, III
**JAMES E. SUDDUTH, III, #35340**
**KOURTNEY L. KECH, #37745**
Attorneys for *Aron Yellott*